IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JOSEPH ALLEN DAVIS, individually and on behalf of all others similarly situated,** | Case No. 1:24-cv-00187-PAB |
| Plaintiff, | JUDGE PAMELA A. BARKER |
| -vs- | |
| **CLEAR HEALTH, LLC,** | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

This mater is before the Court on Defendant Clear Health, LLC's ("Clear Health") Motion to Compel Arbitration (Doc. No. 14), to which Plaintiff Joseph Allen Davis ("Davis") filed a Response (Doc. No. 19) and Clear Health filed a Reply (Doc. No. 21).

For the following reasons, the Court concludes that there exists a genuine dispute of material fact as to whether Davis and Clear Health entered into an agreement to arbitrate and defers ruling on Clear Health's Motion until a jury decides whether Davis entered into an arbitration agreement with Clear Health.

**I.      Background**

    **a.      Davis's Complaint**

On January 31, 2024, Davis filed a class action Complaint against Clear Health, in which he alleges a single cause of action for violations of 47 U.S.C. § 227, the Telephone Consumer Protection Act ("TCPA"). (Doc. No. 1.) In his Complaint, Davis alleges that his residential telephone number has been registered on the National Do Not Call Registry since October 22, 2023. (*Id.* at ¶¶ 18, 20.) Yet, on December 13, 27, and 29, 2023, and on January 5, 2024, Davis received several

"telemarketing calls" from Clear Health, in which it "attempted to offer [him] health insurance." (*Id.* at ¶¶ 21, 24–25.)  Despite indicating that he was not interested and ending the call, Davis continued to receive calls.  (*Id.* at ¶¶ 26.)  After he received three calls from the same number on January 5, 2024, Davis returned a call to that number and spoke to Lauren Haggerty, one of Clear Health's employees, who then continued to promote Clear Health's insurance services.  (*Id.* at ¶¶ 26–29.)

Davis brought his action under Federal Rules of Civil Procedure 23(b)(2) or (b)(3), and seeks certification of a class action of "all persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call[]" from Clear Health "(3) within a 12-month period, (4) from four years prior to" January 31, 2024.  (*Id.* at ¶ 34.)

b.     **Clear Health's Motion to Compel Arbitration**

On June 3, 2024, Clear Health filed the instant Motion.  (Doc. No. 14.)  In its Motion, Clear Health argues that Davis visited the American Career Guide website at the URL https://jobs.theamericancareerguide.com/api/offer (the "Website").  (*Id.* at PageID# 76.)  Clear Health contends that Davis knowingly and voluntarily provided his telephone number and other personal information on the Website, which was then provided to Prospects DM, Inc. ("Prospects"), the company that actually placed the calls to Davis.  (*Id.*)  Clear Health also asserts that Davis, in providing his information and using the Website, agreed to arbitrate the present case.  (*Id.*)  In support

of these arguments, Clear Health attached to its Motion the Declarations of Ben Zitter[1] and Joshua Grant.[2] (*See* Zitter Decl. # 1 (Doc. No. 15); Grant Decl. (Doc. No. 16).)

Mr. Zitter avers that, on September 7, 2023, a user accessed the Website and provided the name "Joseph Allen Davis" and entered the telephone number "(220) 203-8888." (Zitter Decl. #1 at ¶ 6.) According to Mr. Zitter, this user, Davis, then clicked a button labeled "Continue," which had language above it reading, "By clicking the button below, I confirm I am over 18 and I agree to: (i) the Privacy Policy and Terms and Conditions . . . . and (iii) How It Works." (*Id.* at ¶ 9.) The terms "Privacy Policy," "Terms and Conditions," and "How It Works" all contained hyperlinks. (*Id.*)

Clicking on the "Terms and Conditions" hyperlink would have opened the Website's Terms and Conditions webpage. (*Id.* at ¶ 10.) This webpage included the following paragraphs:

DISPUTE RESOLUTION PROVISIONS:

The Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles). Should a dispute arise concerning the Website, Promotions, Content, the terms and conditions of the Agreement or the breach of same by any party hereto: [] the parties agree to submit their dispute for resolution by arbitration before a reputable arbitration organization as mutually agreed upon by the parties in New York, New York, in accordance with the then-current Commercial Arbitration rules of the American Arbitration Association ["AAA"]. . .

To the extent permitted by law, you agree that you will not bring, join or participate in any class action lawsuit as to any claim, dispute or controversy that you may have against Company and/or its employees, officers, directors, members, representatives and/or assigns.

---

[1] Ben Zitter is the Chief Compliance Officer of C4R Media Corp., the company that owns and operates the Website. (Zitter Decl. # 1 at ¶¶ 2, 4, 6.)

[2] Joshua Grant is the President of Prospects DM, Inc., a lead generation company of which Clear Health is a client. (Grant Decl. at ¶¶ 1–2.)

3

(*Id.*; Doc. No. 15-1 at PageID# 164–65.) As referenced in the Terms and Conditions, the AAA's arbitration rules reserve to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." (Doc. No. 14-1 at PageID# 106.) Links to the three documents, including the Terms and Conditions, are included at the bottom of the Website's webpages. (Zitter Decl. # 1 at ¶ 11; Doc. No. 15-1 at PageID# 166.)

According to Mr. Zitter, a user needs to click "Continue" to advance to the next page of the Website, where the user is then prompted to re-enter and "confirm" his telephone number. (Zitter Decl. # 1 at ¶¶ 12–13.) Below this prompt, the webpage reads:

> By checking the box below, I provide my signature expressly consenting to receive sales calls and/or text messages regarding insurance services and/or other offers via an automatic telephone dialing system and/or artificial and/or prerecorded calls from C4R Media Corp or its marketing partners[3] at the cellular/landline telephone number I have provided above, regardless of this number being listed on any federal or state Do Not Call registry. . . . I understand that consent is not required to register or use the site. In order to register without providing consent, leave this box unchecked.

(*Id.* at ¶ 14.) Below this paragraph is a checkbox and the words "I CONFIRM," to the right of which is more text reading "that all of my information is accurate and consent to be called and/or texted as provided above." (*Id.*) Another "Continue" button appears at the bottom of the webpage. (*Id.*)

Mr. Zitter also provides a Certificate of Authenticity for Web Leads, a Session Replay, and an Event Log from software company ActiveProspect, which Mr. Zitter claims suggest that Davis, on

---

[3] Clicking on the hyperlinked "marketing partners" text reveals a list of C4R Media's marketing partners. (Zitter Decl. # 1 at ¶¶ 18–19.) Clear Health is not included in this list, but Health Insurer Quotes (a "'d/b/a' used by a subsidiary of [C4R] Media") and Prospects are included. (*Id.* at ¶¶ 6, 18–19.)

4

September 7, 2023, submitted a form with telephone number "2202038888," checked the "I CONFIRM" box, and then clicked "Continue." (*Id.* at ¶¶ 21–27; Doc. No. 15-4.) The Event Log also reflects a visit to the Website that lasted three seconds. (Doc. No. 15-4.) According to Mr. Zitter, C4R Media Corp.'s ("C4R Media") database further shows that Davis entered and submitted his name, ZIP code 43201, and email to confirm his telephone number of (220) 203-8888. (Zitter Decl. # 1 at ¶ 17.)

According to Mr. Grant, Prospects obtained Davis's information, including his telephone number, solely from a "consent-based, opt-in lead generated on a website operated by C4R Media." (Grant Decl. at ¶¶ 3, 4.) Mr. Grant avers that on January 5, 2024, four hours after Prospects made an unanswered call to Davis's phone relating to Health Insurer Quotes, Davis called Prospects twice. (*Id.* at ¶¶ 5–6.) On his second call, and "only after he expressed interest," Prospects transferred Davis to Clear Health (*Id.* at ¶ 6.)

On July 2, 2024, Davis filed a Response to Clear Health's Motion, to which he attached a Declaration. (Doc. No. 19; Davis Decl. (Doc. No. 19-1).) In his Declaration, Davis in relevant part avers that his number, 220-203-8888,[4] has been registered on the Do Not Call Registry since October 22, 2023. (Davis Decl. at ¶ 3.) Davis avers that he never provided his consent to make calls to his number to C4R Media, Prospects, or Clear Health. (*Id.* at ¶¶ 8–9.) Davis claims that he does not have any record or recollection of visiting the Website and that his Internet browsing history does not contain a record of visiting it despite showing visits to "various unrelated websites." (*Id.* at ¶ 11.)

---

[4] In his Declaration, Davis effectively redacted his phone number, using "XXX-XXXX" to describe it. (Davis Decl. at ¶¶ 2–8.) On August 29, 2024, the Court ordered Davis to file a declaration replacing the "X"s with the numerals that comprise his phone number. (Non-Document Order, Aug. 29, 2024.) That same day, Davis filed on the public docket an un-redacted copy of the first page of his Declaration that omitted the "X"s and spelled out in full his number, 220-203-8888. (Doc. No. 23 at PageID# 238.)

Davis does not recognize the Website and indicates that it is "one [he] never visited." (*Id.* at ¶¶ 11–12, 19.)

Davis further avers as follows. He only obtained the 220-203-8888 telephone number in October 2023, and therefore C4R Media's records are "fabricated" because he could not have submitted his name or information containing his number to the Website in September 2023. (*Id.* at ¶¶ 10–11, 22.) And since the Website is a "job search website," he would not have had a reason to submit his information to it because he was not looking for a job. (*Id.* at ¶ 23.) Davis also could not have submitted his information because, at the time of the purported visit to the Website, he would have been driving home from work. (*Id.* ¶ 24.) Thus, he did not have knowledge of, did not agree to, and would not have agreed to the Website's Terms and Conditions or an arbitration agreement. (*Id.* at ¶¶ 15, 25–26.)

Lastly, according to Davis, Clear Health's evidence contains several "inconsistencies": it would have been impossible for Davis to review the Website and input his personal information in only three seconds, the IP addresses claimed to be associated with Davis's purported visit to the Website are not his IP address and are "internally inconsistent," and his purported ZIP code is incorrect. (*Id.* at ¶¶ 17–18, 21.)

On July 24, 2024, Clear Health filed a Reply, as well as a second Declaration from Mr. Zitter. (Doc. No. 21; Zitter Decl. # 2 (Doc. No. 22).) In his second Declaration, Mr. Zitter avers that the IP address identified by ActiveProspect uses a different protocol from the IP address used by C4R Media's web server. (Zitter Decl. # 2 at ¶ 7.) Mr. Zitter further avers that C4R Media's database only reflects a three-second visit to the last webpage as opposed to the entire Website. (*Id.* at ¶¶ 8–9.) According to Mr. Zitter, before reaching this last webpage, a user clicks "Continue" on the prior

webpage, which then automatically populates the user's telephone number on the last webpage. (*Id.*) The user, therefore, does not have to retype his telephone number before clicking the second "Continue" button on the last webpage. (*Id.*)

II.     **Law and Analysis**

Clear Health moves this Court to compel arbitration in this case under Section 4 of the Federal Arbitration Act ("FAA"). (Doc. No. 14 at PageID# 79.) It insists that Davis visited the Website and entered into a valid agreement, to include the arbitration provision, requiring him to arbitrate his TCPA claim against Clear Health. (*Id.* at PageID# 80.) According to Clear Health, then, the initial determination of whether an agreement to arbitrate exists or was formed "has been delegated to the arbitrator" and "the arbitrator – not a court – is to decide issues of arbitrability." (*Id.* at PageID# 80–81; Doc. No. 21 at PageID# 215–17.)

The Court disagrees. "[T]he duty to arbitrate arises only from the part[ies'] consent." *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 843 (6th Cir. 2021). "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *In re StockX Cust. Data Sec. Breach Litig.*, 19 F.4th 873, 879–80 (6th Cir. 2021) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019)); *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1193 (2024) (citation omitted). This is true even in cases where the agreement at issue includes a provision requiring the parties to arbitrate "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate," which is commonly known as a "delegation provision." *See In re StockX*, 19 F.4th at 878–79 (quoting *Henry Schein*, 586 U.S. at 67–69). These "gateway" arbitrability questions can also include "whether their agreement covers a particular controversy" and whether they have agreed to arbitrate the "formation or existence of the contract containing the [delegation]

7

provision." *Id.* at 880; *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). Thus, where a plaintiff challenges the formation of an arbitration agreement, the court, rather than the arbitrator, must first address the issue of formation before considering challenges to the enforcement or validity of any agreement (including, for example, a non-signatory's standing to enforce an agreement) or any delegation provision therein. *In re StockX*, 19 F.4th at 878–79; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue."); *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355–56 (6th Cir. 2022) (question of non-signatory's ability to enforce agreement is one of "enforceability, not existence" and is distinct from formation question).[5]

---

[5] Relying on *Rent-A-Center*, 561 U.S. 63, Clear Heath contends that where parties to an agreement "have clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator," the court must allow the arbitrator to decide those issues. (Doc. No. 14 at PageID # 80–81; Doc. No. 21 at PageID# 216 ("The arbitrability questions also include . . . whether the parties have agreed to arbitrate . . . .") (citing *Rent-A-Center*, 561 U.S. at 68–69).) According to Clear Health, a challenge to a delegation provision must be made "specifically," as opposed to a challenge to the entire arbitration agreement." (Doc. No. 21 at PageID# 217.) This is not the standard for evaluating challenges to contract *formation*. Only if a court first determines that an agreement *exists* or was formed may a delegation provision *thereafter* be enforced, provided there is "clear and unmistakable" evidence that the parties agreed to have an arbitrator decide arbitrability. *Henry Schein*, 586 U.S. at 70 (quoting *First Options of Chicago, Inc. v. Kaplan*, 545 U.S. 938, 944 (1995)). A plaintiff may then only challenge the delegation provision if he does so "specifically." *In re StockX*, 19 F.4th at 880 (quoting *Rent-A-Center*, 561 U.S. at 72). Clear Health's reliance on *Rent-A-Center* in suggesting that the *formation* question should instead be delegated to the arbitrator under the "clear and unmistakable" evidence standard is misplaced, as the Court in that case "expressly disclaimed any suggestion that its holding would require arbitration of the question whether the parties formed a contract." *Boykin*, 3 F.4th at 844 (citing *Rent-A-Center*, 561 U.S. at 70 n.2). In other words, the "issue of an agreement's 'validity'" is "different from the issue whether any agreement between the parties 'was ever concluded.'" *Rent-A-Center*, 561 U.S. at 70 n.2 (citation omitted).

Clear Health asks the Court to follow *Nelums v. America's Lift Chairs, LLC*, 2023 WL 616997, at *5 (N.D. Ohio Sept. 21, 2023), which involved a similar agreement to the one at issue here, containing a delegation provision. (Doc. No. 14 at PageID# 81–82, 82 n.3.) There, the plaintiff argued that he never visited the website containing the arbitration provision (which was, in effect, an argument that he "never entered into the contract"), and that even if he did, the defendant was not a non-signatory beneficiary of the purported contract. *Nelums*, 2023 WL 616997, at *4–5. However, the court did not consider or evaluate the plaintiff's testimony or evidence (or even his arguments in relation thereto) that he had never entered into an agreement to arbitrate or that there was no formation of contract. *Id.* Instead, the court, relying in part on

8

In this case, Davis disputes that *any* agreement to arbitrate exists. (Doc. No. 19 at PageID# 200–01.) And Clear Health acknowledges that Davis's Response to its Motion rests in part on attacks as to the formation or existence of an agreement. (Doc. No. 21 at PageID# 220–21.) Accordingly, the Court, and not an arbitrator, must decide whether Davis entered into an agreement to arbitrate, notwithstanding the purported delegation provision. *See Boykin*, 3 F.4th at 844 ("[C]ourts . . . must decide th[e] formation question—regardless of what the (alleged) contract says.").

In its Motion, Clear Health contends that Davis entered into a "clickwrap" arbitration agreement under New York law, which Clear Health claims contains a delegation provision delegating issues of arbitrability (e.g., whether Davis's TCPA claim falls within the scope of the agreement) to an arbitrator. (Doc. No. 14 at PageID# 82–85.) Clear Health further argues that, if the Court disagrees and instead determines that arbitrability in this case has not been delegated to the arbitrator, thus requiring the Court to determine the scope of the arbitration agreement, Davis's TCPA claim does fall within the scope of their agreement and Clear Health has standing, as a non-signatory to the agreement, to enforce the agreement under third-party beneficiary and estoppel theories. (*Id.* at PageID# 85–90.) Thus, Clear Health requests that the Court compel Davis to arbitrate his claim and stay the proceedings pending the outcome of arbitration. (*Id.* at PageID# 90.)

In his Response, Davis argues that the Court cannot compel arbitration because he never entered into any agreement and therefore, the formation of the purported agreement is "in issue."

---

*Rent-A-Center* (as Clear Health attempts to do here), focused on the plaintiff's argument that the defendant was a non-signatory beneficiary and applied the "clear and unmistakable" and "specific" challenge standards for evaluating delegation provisions. *Id.* Thus, the court found that the agreement "delegate[d] the gateway question of arbitrability to an arbitrator" and simply observed that because the plaintiff "merely challenge[d] the general existence of the contract, not the delegation clause specifically," the delegation clause should be enforced. *Id.* In effect, then, the *Nelums* court interpreted *Rent-A-Center* differently than this Court does, and this Court declines to follow *Nelums*.

9

(Doc. No. 19 at PageID# 201.) In support of this argument, Davis contends that he never visited and did not need to use the Website. (*Id.* at PageID# 187.) Davis also asserts that Clear Health's evidence showcases several "inconsistencies" because he did not obtain his telephone number until one month after the alleged submission on the Website, his alleged ZIP code is incorrect, and the alleged IP addresses are not his. (*Id.* at PageID# 188–89.) In effect, Davis is disputing the evidence that Clear Health has submitted relative to Davis's use of the Website and submission of his information thereon. Also, Davis submits that it would be impossible to access the Website in three seconds as alleged. (*Id.* at PageID# 200–01.) Additionally, Davis insists that Clear Health cannot enforce the purported agreement for three reasons: (1) it is a non-signatory non-beneficiary of the agreement; (2) the agreement is unenforceable because it is not clear and conspicuous; and (3) the agreement is unconscionable. (*Id.* at PageID# 187–89, 191–92, 196–99.)

In its Reply, Clear Health maintains that Davis's evidence does not establish a genuine issue of material fact as to whether Davis entered into an arbitration agreement. In particular, Clear Health contends that Davis does not raise a genuine issue of material fact concerning whether he entered into the arbitration agreement. (Doc. No. 21 at PageID# 217–20.) Clear Health further replies that the agreement is not conspicuous or unconscionable under New York law. (*Id.* at PageID# 221–26.) Finally, Clear Health argues that Davis does not dispute that he is estopped from avoiding arbitration under New York law. (*Id.* at PageID# 228.)

Section 4 of the FAA provides that:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.  Section 4 also provides, however, that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." *Id.*

The standards of Federal Rule of Civil Procedure 56 "govern whether a court should hold a trial under § 4 when a party alleges that no contract exists." *Boykin*, 3 F.4th at 836, *see also* Fed. R. Civ. P. 81(a)(6)(B).  Because Clear Health is the party asserting the arbitration agreement's existence, under Rule 56, it has the initial burden "to produce evidence that would allow a reasonable jury to find that a contract exists." *In re StockX*, 19 F.4th at 881. To determine whether a contract exists, a court "appl[ies] ordinary state-law principles that govern the formation of contracts."  *Id.* (quoting *First Options*, 514 U.S. at 940).

In this case, Clear Health argues that New York law applies.  (Doc. No. 14 at PageID# 82; Doc. No. 21 at PageID# 227.)  For his part, Davis cites to both New York and Ohio law.   (Doc. No. 19 at PageID# 197 (referring to contract law in "both New York, the alleged choice of law for the agreement, and Ohio, where this case is proceeding").).

The Court concludes that, whether it applies New York or Ohio law, the result is the same. The contract at issue in this case is known as a "clickwrap" agreement, or a contract "formed when a user is presented with a message on his or her computer screen and is required to manifest her assent to the terms."  *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (cleaned up).  New York courts routinely uphold clickwrap agreements as valid and binding contracts "for the principal reason that the user has affirmatively assented to the terms of the agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (citation omitted); *Wu v. Uber Techs., Inc.*, 186 N.Y.S.3d 500, 530 (N.Y. Sup. Ct. 2022), *aff'd*, 197 N.Y.S.3d 1 (N.Y. App. 1st Dep't 2023) (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394 (E.D.N.Y.

11

2015)).  This is true even where, as here, the disputed agreement is contained in a hyperlink.  *See Brooks v. Yang*, 190 N.Y.S.3d 309, 309 (N.Y. App. 1st Dep't 2023); *Meyer*, 868 F.3d at 75–78; *Teta v. Go N.Y. Tours, Inc.*, 2024 WL 325907, at *3–4 (S.D.N.Y. July 1, 2024) (finding clickwrap agreement where terms and conditions were "hyperlinked, as indicated by their blue text, directing users to their provisions").

Ohio courts also recognize the validity of hyperlinked clickwrap agreements and treat them in a substantially similar way. *Campinha-Bacote v. AT&T Corp.*, 2017-Ohio-5608, at ¶ 13 (Ohio App. 10th Dist. 2017) (citing *Ranazzi v. Amazon.com, Inc.*, 46 N.E.3d 213, 2015-Ohio-4411, at ¶ 13 (Ohio App. 6th Dist. 2015)); *Traton News, LLC v. Traton Corp.*, 528 F. App'x 525, 526 n.1 (6th Cir. 2013) (applying Ohio law).

In this case, the Declarations of Mr. Zitter establish that a user purporting to be Davis accessed the Website on September 7, 2023, entered Davis's personal information (to include his name and his telephone number, (220) 203-8888), and clicked a "Continue" button indicating assent to and acknowledgement of the Website's Terms and Conditions, which included the arbitration agreement. (Zitter Decl. # 1 at ¶¶ 6, 9–10; Zitter Decl. # 2 at ¶¶ 4–5.).)  The Court concludes that, therefore, Clear Health has met its initial burden of producing evidence that a contract or agreement to arbitrate exists.

The burden now shifts to Davis "to present 'specific facts, as opposed to general allegations,' that would allow a rational trier of fact to find that he did not" agree to the Website's arbitration agreement.  *Boykin*, 3 F.4th at 839.  Davis has submitted his Declaration that contains "specific facts" to carry this burden.

In his Declaration, Davis avers that he has no record or recollection of visiting the Website or viewing the Terms and Conditions containing the arbitration agreement, the Website is "one [he]

12

never visited," and he would not have agreed to arbitration.  (Davis Decl. at ¶¶ 9, 15, 19.)  Davis also avers, under penalty of perjury, that he could not have submitted his name or information containing his (220) 203-8888 number in September 2023 because he only obtained the number in October 2023.  (*Id.* at ¶ 22.)  Davis further avers that the submitted ZIP code, 43201, is not his ZIP code, and that it would have been impossible for him to visit the website for three seconds, as Mr. Zitter's Event Log indicates.  (*Id.* at ¶ 17.)

The Court concludes that Davis's Declaration creates a genuine issue of material fact that he entered into an agreement to arbitrate.  First, Davis denies ever visiting the Website.  While a "convenient memory lapse" does not create a factual dispute, an "unequivocal denial" can.  *Boykin*, 3 F.4th at 839–40 (citations omitted).  Davis's sworn statement that he "never visited" the Website is, in effect, an unequivocal denial that he ever checked the necessary boxes or clicked the hyperlink containing the Terms and Conditions.  *Id.* at 840.

Second, Davis avers that he only obtained the telephone number at issue in October 2023, a month after the number was submitted with his personal information.  A reasonable juror could infer that Davis therefore did not submit a form on the Website with that telephone number a month before he obtained it.  *See Edmonson v. Captain D's LLC*, 2024 WL 2164619, at *3 (M.D. Tenn. May 14, 2024) (finding fact issue where, in part, plaintiff testified that he could not access his account until August 24, and may not have been able to sign an arbitration agreement on July 12); *Denman Springs, LLC v. L.G. Burke, Inc.*, 2020 WL 10317734, at *2 (E.D. Tex. Dec. 22, 2020) (fact issue where, in part, contract "could not have been seen or approved by" plaintiff's managers on October 21 because plaintiff "did not exist as a business entity until October 31").  Contrary to Clear Health's assertion that Davis provides no evidence that he had not obtained his telephone number until October 2023,

13

the Court finds that Davis's testimony to that effect *is* evidence. (Doc. No. 21 at PageID# 218.) *See Grassi v. Grassi*, 2021 WL 3355475, at *6 (6th Cir. Aug. 3, 2021) (holding that plaintiff's affidavit testimony is "not 'no evidence'" and created a factual issue as to the authenticity of contract) (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 325, 329 (6th Cir. 2010)).

The Court is not persuaded by Clear Health's contention that it is "simply inconceivable" that someone other than Davis "could have submitted his information with a telephone number that had yet to be assigned to him" eleven times. (*Id.* at PageID# 218.) Clear Health cites no authority to show that because a telephone number is submitted with accompanying personal information, including some information (here, a ZIP code) that is averred to be incorrect, the individual whose information is submitted must have been the user who accessed the website.

Viewing all facts and inferences in the light most favorable to Davis, as the Court must do, the Court concludes that has created placed the formation of an arbitration agreement "in issue," and a trial on the matter is warranted.

### III. Conclusion

For the reasons set forth above, the Court, having found that a genuine dispute of material fact exists as to whether Davis and Clear Health agreed to arbitrate, defers ruling on Clear Health's Motion (Doc. No. 14) until a jury determines whether Davis entered into an arbitration agreement.

**IT IS SO ORDERED.**

                                            *s/Pamela A. Barker*
                                            PAMELA A. BARKER
Date: September 4, 2024                  U. S. DISTRICT JUDGE